

# 21-0885-cr(L), 22-0334-cr(CON)

## United States Court of Appeals

*for the*

## Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

VICTOR HUGO DIAZ MORALES, AKA Victor Hugo Villegas Castillo, AKA Rojo, MARIO JOSE CALIX HERNANDEZ, MAURICIO HERNANDEZ PINEDA, AMADO BELTRAN BELTRAN, AKA Don Amado, OTTO RENE SALGUERO MORALES, AKA Otto Salguero, RONALD ENRIQUE SALGUERO PORTILLO, AKA Ronald Salguero, FERNANDO FELIX RODRIGUEZ, AKA Don Fernando,

*Defendants,*

JUAN ANTONIO HERNANDEZ ALVARADO, AKA Tony Hernandez, GEOVANNY FUENTES RAMIREZ, AKA Sealed Defendant 1,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**BRIEF AND SPECIAL APPENDIX FOR DEFENDANT-APPELLANT
JUAN ANTONIO HERNANDEZ ALVARADO, AKA TONY HERNANDEZ**

JESSE M. SIEGEL
LAW OFFICE OF JESSE SIEGEL
*Attorney for Defendant-Appellant Juan
Antonio Hernandez Alvarado, AKA
Tony Hernandez*
299 Broadway, Suite 800
New York, New York 10007
(212) 207-9009

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................................... iii

JURISDICTIONAL STATEMENT PURSUANT TO F.R.A.P. 28(a)(4) ............... 1

QUESTIONS PRESENTED ...................................................................................... 1

STATEMENT OF THE CASE .................................................................................. 2

STATEMENT OF FACTS ........................................................................................ 3

    A.    Background ................................................................................... 3

    B.    The Charges ................................................................................. 4

    C.    The Trial ...................................................................................... 5

            1.    Cooperating witnesses .................................................... 6

            2.    Other witnesses .............................................................. 21

            3.    The Verdict ..................................................................... 24

    D.    Sentencing ................................................................................. 25

ARGUMENT ........................................................................................................... 26

POINT I

THE DISTRICT COURT ERRED WHEN IT FAILED TO
SUPPRESS MR. HERNANDEZ'S STATEMENT, AS AN AGENT
INTERROGATED HIM DESPITE KNOWING HE WAS
REPRESENTED BY COUNSEL, HE UNAMBIGUOUSLY
ASKED THAT HIS ATTORNEY BE CALLED, AND HE WAS
TRICKED AND MANIPULATED INTO WAIVING HIS RIGHT
TO REMAIN SILENT ............................................................................. 26

    A.    Factual Background ................................................................... 26

    B.    The Court's Decision ................................................................ 32

    C.    The government violated the no-contact rule when they
        interrogated Mr. Hernandez outside the presence of counsel
        despite knowing he was represented ....................................... 33

D.    The government violated the Fifth and Sixth Amendments when they continued to question Mr. Hernandez after he asked to speak with his attorney, and tricked and manipulated him into proceeding in the attorney's absence ....................................38

POINT II

STATEMENTS BY THE GOVERNMENT DURING ITS SUMMATIONS WERE IMPROPER, INFLAMMMATORY AND PREJUDICIAL ............................................................46

A.    The Summations.................................................47

B.    Applicable Law ...............................................51

C.    The Government's Improper Comments Caused Substantial Prejudice ...........................................................52

POINT III

THE DISTRICT COURT FAILED TO ENSURE MR. HERNANDEZ RECEIVED A TRIAL BY AN IMPARTIAL JURY AND DUE PROCESS WHEN, AFTER DISMISSING ONE JUROR, IT DENIED A REQUEST TO DETERMINE WHETHER AT LEAST ONE MORE JUROR HAD BEEN SUBJECT TO THE SAME IMPROPER CONTACT ..................................59

A.    Factual Background............................................60

B.    Applicable Law ...............................................61

C.    The district court failed to investigate despite knowing that a juror had noticed his or her picture being taken and discussed it with the juror who was dismissed, violating Mr. Hernandez's rights to trial by an impartial jury and due process ........................................................63

CONCLUSION ..............................................................66

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Anderson v. Smith*,
751 F.2d 96 (2d Cir. 1984) ...................................................................43

*Campaneria v. Reid*,
891 F.2d 1014 (2d Cir. 1989) ...............................................................44

*Darden v. Wainwright*,
477 U.S. 168 (1986) .............................................................................52

*Edwards v. Arizona*,
451 U.S. 477 (1981) .........................................................................38, 39

*Fare v. Michael C.*,
442 U.S. 707 (1979) .............................................................................42

*Johnson v. Zerbst*,
304 U.S. 458 (1938) .........................................................................40, 42

*Maine v. Moulton*,
474 U.S. 159, 106 S. Ct. 477 (1985) ....................................................41

*Maryland v. Shatzer*,
559 U.S. 98 (2009) ...............................................................................44

*Michigan v. Harvey*,
494 U.S. 344, (1990) .............................................................................39

*Minnick v. Mississippi*,
498 U.S. 146, 111 S. Ct. 486 (1990) ....................................................39

*Miranda v. Arizona*,
384 U.S. (1966) .............................................................................*passim*

*Smith v. Illinois*,
469 U.S. 91 (1984) ...............................................................................39

*Smith v. Phillips*,
455 U.S. 209 (1982) .............................................................................62

*United States v. Aiello*,
771 F.2d 621 (2d Cir. 1985) ............................................................62, 63

*United States v. Burse*,
    531 F.2d 1151 (2d Cir. 1976) ........................................................................58, 59

*United States v. Carter*,
    236 F.3d 777 (6th Cir. 2001) ........................................................................52, 55

*United States v. Diaz*,
    891 F.2d 1057(2d Cir. 1982) ..............................................................................38

*United States v. Dutkel*,
    192 F. 3d 893 (9th Cir. 1999) .............................................................................64

*United States v. Elias*,
    285 F.3d 183 (2d Cir. 2002) ...............................................................................52

*United States v. Friedman*,
    909 F.2d 705 (2d Cir. 1990) .........................................................................*passim*

*United States v. Hammad*,
    858 F.2d 834 (2d Cir. 1988) ...............................................................32, 34, 35

*United States v. Isam*,
    588 F.2d 858 (2d. Cir. 1978) ..............................................................................38

*United States v. Moten*,
    582 F.2d 654 (2d Cir. 1978) ...............................................................................62

*United States v. Quiroz*,
    13 F.3d 505 (2d Cir. 1993) ..........................................................................40, 43

*United States v. Ruggiero*,
    928 F.2d 1289 (2d Cir. 1991) .............................................................................62

*United States v. Ryans*,
    903 F.2d 731 (10th Cir. 1990), *cert denied*, 498 U.S. 855 (1990) ......................35

*United States v. Schwarz*,
    283 F.3d 76 (2d Cir. 2002) .................................................................................62

*United States v. Shareef*,
    190 F.3d 71 (2d Cir. 1999) .................................................................................52

*United States v. Young*,
    470 U.S. 1 (1985) ...............................................................................................51

**Statutes & Other Authorities:**

18 U.S.C. § 1001 ................................................................................2, 5

18 U.S.C. § 3231 ....................................................................................1

18 U.S.C. § 3238 ............................................................................2, 4, 5

18 U.S.C. § 924(c)(1)(A) ....................................................................2, 4

18 U.S.C. § 924(c)(1)(B)(ii) ...............................................................2, 4

18 U.S.C. § 924(o) .............................................................................2, 5

21 U.S.C. § 963 .................................................................................2, 4

28 U.S.C. § 530B(a) ...............................................................................33

28 U.S.C. § 530B(b) ...............................................................................33

28 U.S.C. § 1291 .....................................................................................1

22 N.Y.C. R.R. § 1200 ...........................................................................34

F.R.A.P. § 4(b) .........................................................................................1

F.R.A.P. § 28(a)(4) ..................................................................................1

Model Code of Prof'l Responsibility DR 7-104(A)(1) ....................34, 35

N.Y. Rules of Prof'l Conduct 4.2(a) ...............................................32, 34

# JURISDICTIONAL STATEMENT
# PURSUANT TO F.R.A.P. 28(a)(4)

Juan Antonio Hernandez Alvarado was charged with committing offenses against the United States for which the district court had jurisdiction pursuant to Title 18, United States Code, section 3231. He appeals from a final judgment entered March 31, 2021. This Court, therefore, has jurisdiction pursuant to Title 28, United States Code, section 1291. By filing a timely notice of appeal on April 7, 2021, (A[1]-1529), he complied with Federal Rule of Appellate Procedure 4(b).

# QUESTIONS PRESENTED

1. Whether the government violated the no-contact rule when an agent interrogated Mr. Hernandez after he was arrested outside the presence of his attorney, despite knowing Mr. Hernandez was represented by counsel.

2. Whether Mr. Hernandez's Fifth and Sixth Amendment rights were violated when he was interrogated after asking that his attorney be called and tricked and manipulated into waiving his *Miranda* rights.

3. Whether Mr. Hernandez was substantially prejudiced by comments by the government during its summations, which, *inter alia*, implied defense counsel had made improper and dishonest arguments.

4. Whether Mr. Hernandez's rights to due process and to be tried by an impartial jury were violated when the district court failed

---

[1] References to "A-" are to the Appendix filed with this brief.

to investigate information that a juror had seen someone taking his picture outside court who did not appear to be from the media and discussed it with at least one other juror.

## STATEMENT OF THE CASE

Juan Antonio Hernandez Alvarado appeals from a final judgment of the United States District Court for the Southern District of New York (Castel, D.J.), entered March 31, 2021, convicting him, after a jury trial, of Conspiracy to Import Cocaine into the United States, in violation of Title 21, United States Code, section 963 and Title 18, United States Code, section 3238 (Count One); Possession of Machineguns and Destructive Devices, in violation of Title 18, United States Code, sections 924(c)(1)(A), 924(c)(1)(B)(ii), 3238 and 2 (Count Two); Conspiracy to Possess Machineguns and Destructive Devices, in violation of Title 18, United States Code, sections 924(o) and 3238 (Count Three); and Making False Statements, in violation of United States Code, section 1001 (Count Four). (SPA[2]-1-2.)

The district court sentenced Mr. Hernandez to life terms of imprisonment on Counts One and Three, and a 60-month term on Count Four, all to run concurrently, and a consecutive, mandatory 360-month term of imprisonment on

_____

[2] References to "SPA-" are to the Special Appendix filed with this brief.

Count Two.  The court also imposed five-year terms of supervised release on

Counts One, Two and Three, and a three-year term of supervised release on Count

Four, all to run concurrently, and ordered forfeiture in the amount of $138,500,000.

(SPA-3, 4, 8.)


## STATEMENT OF FACTS[3]

**A. Background.**

Juan Antonio Hernandez Alvarado is a Honduran national who, during some

of the period covered by the indictment, was a member of the Honduran Congress

and brother of the Honduran President.  At trial, the government sought to prove he

conspired with drug traffickers and corrupt government officials to distribute

cocaine by, among other things, using his government connections to provide

information regarding checkpoints, air patrols, and radar, to allow traffickers to

import cocaine into Honduras and move it to the border with Guatemala, from

where it was transported to Mexico and, ultimately, the United States.

The government also sought to prove he distributed his own cocaine, also

headed to the United States; solicited and accepted bribes in the form of donations

to his brother's Presidential campaigns, in return for the protection and information

---

[3] Facts relevant to the issues raised in this appeal are set forth in the Argument section, *below*.

he provided; possessed and sold guns, including machineguns; attended meetings at which protection was provided by heavily armed security who possessed guns and machineguns; and arranged for traffickers to have access to helicopters to move drugs.

Finally, the government sought to prove that, in October 2016, Mr. Hernandez met with a prosecutor and agents and lied to them.

### B. The Charges.

**Count One** of Indictment Number S2 15 Cr. 379 (PKC), filed November 23, 2018, charged Mr. Hernandez with Conspiracy to Import Cocaine into the United States, in violation of 21 U.S.C. § 963 and 18 U.S.C. §§ 3238. It alleged that, from at least in or about 2004 up to and including 2016, he and others conspired to violate the narcotics laws of the United States by distributing and possessing with intent to distribute at least five kilograms of cocaine, intending, knowing, and having reason to believe it would be imported into the United States. (A-32-36.)

**Count Two** of the indictment charged Mr. Hernandez with Possession of Machineguns and Destructive Devices, in violation of 18 U.S.C. §§ 924(c)(1)(A), 924 (c)(1)(B)(ii), 3238 and 2. It alleged that, from at least in or about 2004 up to

and including 2016, he and others knowingly used and possessed machineguns and destructive devices during and in relation to the narcotics importation conspiracy charged in Count One. (A-37-38.)

Count Three of the indictment charged Mr. Hernandez with Conspiracy to Possess Machineguns and Destructive Devices, in violation of 18 U.S.C. §§ 924(o) and 3238. It alleged that, from at least in or about 2004 up to and including 2016, he and others conspired to knowingly use, carry and possess machineguns and destructive devices during and in relation to the narcotics importation conspiracy charged in Count One. (A-38-39.)

Count Four of the indictment charged Mr. Hernandez with Making False Statements, in violation of 18 U.S.C. § 1001. It alleged that on or about October 25, 2016, in a meeting with DEA agents, among others, he made misrepresentations in connection with the criminal conduct charged in Counts One through Three, "including that he never accepted money from drug traffickers for any purpose and never provided assistance to drug traffickers in any way."  (A-39-40.)

## C.  The Trial.

The government's witnesses included cooperators (drug traffickers and

corrupt government officials who testified they conspired with Mr. Hernandez), members of law enforcement, and others. Mr. Hernandez did not testify on his own behalf.

### 1. Cooperating witnesses.

VICTOR HUGO DIAZ MORALES, a/k/a "Rojo, pled guilty pursuant to a cooperation agreement to trafficking cocaine and methamphetamine into the United States, and conspiring to and actually carrying firearms and explosive devices in order to traffic cocaine into the United States. He was responsible for approximately 18 murders and injuring four other people. (A-342-43.) Diaz Morales was facing a term of imprisonment of life plus 30 years, and hoped to receive a sentencing benefit by cooperating with the government and testifying at trial. (A-227.)

He testified he trafficked cocaine with Mr. Hernandez from approximately 2004 to 2016. Mr. Hernandez assisted him by providing information about police checkpoints and investigations, and supplied Diaz Morales with cocaine. Diaz Morales distributed about 140,000 kilos of cocaine with Mr. Hernandez's assistance, which was destined for the United States. He had seen Mr. Hernandez with pistols and assault rifles. (A-343-45.)

Diaz Morales viewed photographs and identified several prominent

traffickers with whom he had worked, including Hector Emilio Fernandez Rosa, a/k/a "Don H," Antonio Santos, and Juancho Leon.  He also identified a picture of Carlos Toledo, who introduced him to Mr. Hernandez in about 2004, at a meeting attended by several other powerful traffickers, including Oscar Martinez and Mario Jose Calix. (A-353-55.)

Diaz Morales said he continued to meet with Mr. Hernandez about three to four times a year between 2004 and 2010, to confirm he had received his payments and for Mr. Hernandez to provide police information.  (A-356.) Typically, the meetings were attended by Mr. Hernandez, Toledo, Martinez, Calix, a trafficker named Juan Carlos Valenzuela, and Valenzuela's bodyguard.  Diaz Morales said he was armed at the meetings, and saw Mr. Hernandez with pistols, assault rifles, and armed security.  (A-355-58.)

Diaz Morales said that in about 2005, he met with Mr. Hernandez and other traffickers and Mr. Hernandez requested a $40,000 contribution to the Congressional election campaign of his brother, Juan Orlando Hernandez, which Diaz Morales provided.  (A-360-61.) At another meeting, in about 2006, Mr. Hernandez said he was producing cocaine with a Colombian named "Cinco," who had labs, and they were marking the kilos with "TH," in a style similar to the Tommy Hilfiger logo.  (A-361-62.) Diaz Morales described shipments of cocaine

he said he had received from Mr. Hernandez and Cinco.

Diaz Morales described another meeting attended by Mr. Hernandez, and identified individuals in a photo taken at the meeting, including Arnulfo and Luis Valle Valle, brothers who led the "Valle Valle Cartel," and a Guatemalan trafficker named Jose Manuel a/k/a Che, who was supplied by the Valle Valles. (A-368.) At a meeting in 2007, Mr. Hernandez offered to provide information about naval operations. (A-372-73.)

This information was valuable to Diaz Morales, as he used fishing boats and "go-fast" boats to bring cocaine into Honduras. (A-376.) Diaz Morales said he also brought cocaine into Honduras by plane, which landed on clandestine airstrips. (A-377.) He identified the routes he used, noting that a crossing into Guatemala at El Paraiso Copan was controlled by Alexander Ardon, the mayor of the town. (A-379-80.) Mr. Hernandez provided information about operations at the Puerto Castilla naval base and army base near the Naco checkpoint, which was valuable to him. (A-383-84.) Diaz Morales paid $10,000 whenever Mr. Hernandez provided such information. (A-385.)

Diaz Morales said that, at various meetings, Mr. Hernandez offered help keeping corrupt police officers assigned where they could assist him, and preventing them from being transferred, including Police Chief Normando Rafael

Lozano, who accompanied Diaz Morales' drug shipments armed with a Galil assault rifle, and Police Officer Mauro Flores Santos. (A-391-97.) He testified about other corrupt police officers that assisted him, including Mr. Hernandez's cousin, Mauricio Hernandez Pineda, and Giovanny Rodriguez. (A-398-403.)

Diaz Morales described how Mr. Hernandez assisted him with shipments by airplane and helicopter. This included information about radar used by the military, which they called "TV" or television, for which he paid $50,000 to Mr. Hernandez. (A-411-13.) He also described other specific deals in which he had purchased cocaine from Mr. Hernandez and Cinco, including one of about 1000 kilos for which security was provided by the Honduran National Police. (A-414-16.)

Diaz Morales described a $100,000 contribution he made in 2009 to the political campaigns of Pepe Lobo, who was running for President, and Juan Orlando Hernandez, running for re-election as a congressman. Mr. Hernandez said that if the campaigns were successful, they would have greater connections and access to information. (A-416-19.) They would also be protected from being extradited to the United States. (A-420-21.)

In about 2010, Diaz Morales said, he purchased ammunition for assault rifles from Norman Lozano, that Lozano said he had purchased from Mr. Hernandez.

The 4000 to 6000 rounds was packaged in metal boxes with the Honduran National Army logo. (A-425-26.)

Diaz Morales described how he left Honduras for Colombia because of his war against Hector Emilio Fernandez Rosa, a/k/a Don H. They tried to have each other killed, and Diaz Morales killed the three year-old daughter of one of Don H's supporters. (A-426-27.) He also described shooting his own wife in the face. (A-429.)

AMILCAR ALEXANDER ARDON SORIANO had been the mayor of El Paraiso Copan, an important cocaine trans-shipment point. Pursuant to a cooperation agreement, Ardon pled guilty to "drug trafficking, murders, the use of automatic weapons, money laundering, and cooperating with other drug traffickers in the use of high powered guns." (A-576.) He admitted being responsible for 56 murders, injuring but not killing 6 other people, and engaging in torture. (*Id*.) Ardon was facing a term of imprisonment of life plus 30 year and hoped to receive a sentencing benefit by cooperating with the government and testifying at trial. (A-465.)

Ardon testified that Mr. Hernandez helped him and his family distribute "[a]round 30 to 40 tons of cocaine" from 2010 until Mr. Hernandez was arrested (in 2018). (A-577.) This was out of an estimated 250 tons of cocaine Ardon and

his family had exported to the United States. (A-588.) He also had seen Mr. Hernandez with guns, including semiautomatic pistols and AR-15s, and identified photos of some, including an M60, a high-powered gun. (A-578-84.) To protect his cocaine business, Ardon himself had used AR-15s, M16s, AK-47s and bazookas. (A-587.)

At a meeting with Mr. Hernandez, Chapo Guzman, and others, in 2013, Ardon said Chapo gave Mr. Hernandez $1 million for his brother's campaign. (A-585-86.)

In about 2009, Ardon said, Mr. Hernandez told him that he had Colombian suppliers who could sell cocaine and that he could supply Ardon. This included 280 kilograms, which would be transported by helicopter once it arrived in Honduras. (A-623-24.) Ardon's worker, Chino, would be in charge of receiving it. When it arrived, Ardon had security in the area armed with AR-15s, M16s, AK-47s and a bazooka. (A-627.)

Thereafter, in 2010, Ardon testified, Mr. Hernandez sent him shipments by helicopter once and sometimes twice a month. (A-629.) In about 2011, Ardon began sending shipments by boat, sometimes as often as once a month. If the shipments were large, they were transported from the coast to El Paraiso by truck, and were guarded by security armed with M16s and AR-15s. (A-633-38.) Some of

the kilos had the "TH" stamp.  (A-639.)

Ardon implicated Mr. Hernandez in two murders.  In one, a trafficker named Franklin Arita told Ardon that he did not want Ardon transporting cocaine through his territory. Ardon spoke with Mr. Hernandez, who said he would speak with Tigre Bonilla, the police chief in Copan.  Later, Mr. Hernandez told Ardon that Bonilla had killed Arita.  (A-641-43.)

In the other, Chino, the individual who received the cocaine transported by helicopter, was arrested in 2013.  Ardon said Mr. Hernandez told him he would have to be killed because he had all the information about the helicopters.  Ardon had him killed in jail.  (A-650-57.)

In 2013, Ardon arranged a meeting between Chapo Guzman and Mr. Hernandez. Chapo asked Mr. Hernandez if he could provide security for shipments from the Nicaraguan border to the Guatemalan border.  Mr. Hernandez assured that if his brother was elected President, he could arrange the security.  He also said that, if his brother were elected, neither Ardon nor the Valle brothers would have to worry about being extradited to the United States.  In return, Chapo offered $1 million for the campaign, which he later accepted. At a subsequent meeting, Chapo gave a bag containing the $1 million to Mr. Hernandez.  (A-658-65.) Juan Orlando Hernandez won the election.  (A-667.)

Ardon surrendered in 2019 and began meeting with the government.  He admitted that he withheld information about Mr. Hernandez, Juan Orlando Hernandez and Chapo Guzman during some of the meetings.  (A-678.)

On cross-examination, Ardon said he had made between $200 and 250 million dollars trafficking drugs.  (A-686.) He did not turn over any money to the United States government as part of his cooperation.  (A-697-98.) He explained that he had only a small amount of money left, as he had re-invested his earnings in buying and selling drugs, bribing politicians and the police, and purchasing equipment, ranches, houses and agricultural machinery.  (A-698-99.) Moreover, Ardon claimed the money "was used to build homes for the poor and highways for the poor and to give them electricity."  (A-699.)

GIOVANI RODRIGUEZ, was a former Honduran National Police officer who testified pursuant to a cooperation agreement.  He pled guilty to conspiracy to traffic, import and distribute drugs, carrying and possessing firearms, and "machine gun and long weapons conspiracy." He also admitted other conduct, including committing a murder.  (A-919, 922.)  Rodriguez was facing life and hoped to receive a sentencing benefit by cooperating with the government and testifying at trial.  (A-936.)

He testified he had trafficked drugs with Mr. Hernandez and others,

including Rojo, Vladimir Paredes, Ruben Mejia, and Hector Emilio Fernandez. He assisted them by providing information and security and protection for drug shipments. (A-919-20.)

Rodriguez said he had never met Mr. Hernandez, but had worked for him in 2011-12, through another individual, Mauricio Hernandez. When he provided security, he and others were armed with pistols and AR-15 automatic weapons. (A-920-21.)

Rodriguez said he met Rojo in about 2005 and began assisting him in drug trafficking, by giving information about checkpoints, and providing security for shipments. He assisted Rojo in connection with about 15 to 25 shipments. (A-924.)

Rodriguez testified that another corrupt national police officer, Mauricio Hernandez Pineda, told him in about 2006-07 that he also provided security for Rojo's shipments, and said they were both protected by Mr. Hernandez. (A-925.)

He also testified about trafficking drugs with two attorneys, Juan Manuel Avila Meza and Oscar Ramirez, who represented him when he was arrested in Honduras in 2009 and accused of stealing drugs. Although he was convicted of abuse of power and violation of public servant's duties, he was able to get the conviction vacated by bribing a judge, and was reinstated to the National Police.

(A-926-29.)

After being released from prison, Rodriguez was approached by Hernandez Pineda, who wanted him to provide information about operations targeting drug trafficking. He provided such information and received a promotion. Hernandez Pineda said Mr. Hernandez had arranged the promotion. (A-931-32.)

Before surrendering to the United States in 2016, Rodriguez said, he was approached by Hernandez Pineda. Hernandez Pineda gave him $500 and warned him not to mention involvement in drug trafficking by him, Mr. Hernandez, or Juan Orlando Hernandez. (A-934.)

Cooperating witness DEVIS RIVERA MARADIAGA surrendered to the DEA in January 2015. He testified pursuant to a cooperation agreement which required him to plead guilty to crimes related to his leadership of a drug trafficking organization, the "Cachiros," including drug trafficking, murders, money laundering and "possession of war weapons." He was responsible for murdering 78 people, injuring 15 others, and engaging in torture. As a result of his plea, Maradiaga was facing a mandatory minimum sentence of life plus 30 years. (A-975-76.) Maradiaga hoped to receive a sentencing benefit by cooperating with the government and testifying at trial.

Maradiaga had been working with the DEA since November 2013. (A-975.)

He said he met Mr. Hernandez in early 2014, to ask for his help getting the

Honduran government to pay highway contracts it owed his company, "Inrimar."

This was a way in which he laundered his drug money.  (A-977.)

Describing his activities with the "Cachiros," his organization, Maradiaga

said he and his partner - and brother - Javier Rivera, received cocaine shipments in

Honduras by planes and go-fast boats, transported them across Honduras, and sold

the drugs to other traffickers.  Starting in about 2002, he had trafficked

"[a]pproximately over 130 tons of cocaine, which wound up in the United States."

To protect the drug shipments, the Cachiros used weapons, including AK-47s, AR-

15s, RPG-7s, and Claymore mines.  They also bribed politicians, judges,

prosecutors, and members of the Honduran National Police and National Army.

(A-978-80.) From about 2004 to 2013, they worked with the Valle brothers, heads

of the Valle Valle cartel.

Maradiaga had laundered money by investing proceeds from drug trafficking

in government highway contracts.  When the work was completed, the government

would deposit the money into the Inrimar accounts.  By the time Juan Orlando

Hernandez assumed the presidency, the government owed a substantial amount of

money to Maradiaga's front companies.  (A-988.)

Maradiaga described a meeting he had with Mr. Hernandez to discuss the

Inrimar contracts.  It happened at a Denny's in Tegucigalpa, Honduras, in February 2014, and he video recorded it on his watch.  (A disk of the video recording and transcript of the video were introduced in evidence by stipulation as Government Exhibits 401 and 401-T.) (A-992.)

The meeting was arranged by an intermediary, Avila Meza, who said that Mr. Hernandez wanted to work with Maradiaga in drug trafficking and would help get his front companies paid by the government in return for an advance of $100,000 and a house in Tegulcigalpa.  Avila Meza was at the meeting.  (A-996-97.)

Not long after, Maradiaga met again with Avila Meza, and an attorney who Meza said was representing Mr. Hernandez, Oscar Ramirez.  Maradiaga made a partial payment of $50,000. Ramirez told him to talk directly with Mr. Hernandez about drug trafficking because he wanted to work with him, and told him to bring the Inrimar contracts to the meeting, so Mr. Hernandez could get to work on them.  (A-1000-01.)

Another meeting followed at Denny's, attended by Maradiaga; Avila Meza; Maradiaga's worker, Edgardo Perez, who worked at Inrimar and brought the contracts; and Mr. Hernandez, protected by heavily armed security.  (The government displayed a freeze frame from the meeting showing Maradiaga's

cousin, Ney Turcios, Edgardo Perez, and Mr. Hernandez.) (A-1003.) The government reviewed the videotape and transcript, in which they discussed the need to move the Inrimar contracts to another front company run by Edgardo Perez, as Inrimar was under investigation, and generally how to deal with getting them paid. (A-1003-09.) At one point, another $50,000 bribe was paid. There were no discussions about drug trafficking at the point because, according to Maradiaga, they were focused on the Inrimar contracts, and Maradiaga expected there would be more meetings, although there were not. (A-1010-11.)

Maradiaga testified as to discussions he had with a trafficker named Wilter Blanco about one of Blanco's workers, "Chino," who had been arrested. Blanco was worried about Chino, and asked Maradiaga if he had a contact that could murder Chino in prison. Maradiaga arranged the murder. (A-1021-22.)

On cross-examination, Maradiaga admitted he had three people killed at the time he started cooperating with the DEA, and did not disclose them at the time. He explained that they were not discussing murders at that point, but only drug trafficking "topics" and politicians. (A-1027-28.)

Maradiaga said he had made "approximately over $50 million" dollars trafficking drugs. (A-1039.) The money that he still had was "put away somewhere in Honduras," and he did not tell the DEA about it because he was not

asked about it.  (A-1041.)

Maradiaga said he had turned over the tape of the meeting at Denny's to the DEA on the day it was recorded, although he could not recall the name of the person he handed it to."  (A-1056-57.)  Subsequently, the government disclosed that Maradiaga had not "testified accurately" about his handling of the recording of the Denny's meeting entered into evidence as GX 401.  (A-1079.)  On re-direct, the government elicited that, in fact, he had given the tape to his attorney, who had turned it over to the DEA several weeks later.  (A-1080-81.)

FERNANDO CHANG MONROY was a Guatemalan drug trafficker who distributed about 200,000 kilos, ultimately destined for the United States, and testified that he distributed about 15,000 kilos with Mr. Hernandez.  (A-1124-25.) Chang was also involved in about 15 murders.  (A-1126.)

Chang said he purchased M16 rifles from Mr. Hernandez in about 2012.  (A-1126.)

Chang said he first participated in a cocaine deal with Mr. Hernandez in 2008, when he purchased 600 kilos.  Also involved in the deal were Rojo, Tonito Santos, the Valles, and Che.  (A-1128.) He was told by Santos that Mr. Hernandez supplied the drugs.  (A-1129.) The drugs were delivered to him on the border between Guatemala and Mexico, and he sent them to the Sinaloa Cartel in Mexico

City. (A-1129-30.) The cocaine had a "Tias" stamp on the wrappings, and Chang said Mr. Hernandez told him that he used that stamp. (A-1130-31.)

In about 2009, Chang said, he attended a meeting with Mr. Hernandez, Tonito Santos and Cinco, to discuss a 700-kilo deal. Mr. Hernandez told him he had a "kitchen" to manufacture cocaine, and had many police officers working for him. Chang said that he could purchase airplanes in the United States and take them to Guatemala. Everyone at the meeting was armed with 9 millimeter guns, and Mr. Hernandez advised him he could get any type of guns. Chang asked about "five point seven guns," "RPG sevens," grenade launchers, and M16s. (A-1132-36.)

They also finalized a deal for 700 kilos. Later, he noticed that Mr. Hernandez's 4-person security detail was carrying Galil rifles. Chang said that, at Mr. Hernandez's direction, they stopped to speak with the local police chief to let him know they would be moving the 700 kilos, but the police chief had already been informed by Mr. Hernandez. (A-1139-40.) Chang said he received the cocaine at the border, and delivered it to the Sinaloa Cartel in Mexico City. (A-1141-42.)

Chang said he participated in about five more deals with Mr. Hernandez, ending in about 2010. (A-1143.)

Chang testified he purchased about 100,000 rounds of ammunition from Rojo in about 2011, and Rojo said the ammunition was supplied by Mr. Hernandez. He also purchased 40 M-16 rifles from Mr. Hernandez, which he sold to the Sinaloa Cartel with 600 kilos of cocaine with the "TH" stamp. (A-1150-53.)

In about 2016, Chang had pled guilty in the Eastern District of Virginia to importing cocaine into the United States, pursuant to a cooperation agreement, and been sentenced to a 262-month term of imprisonment. In about 2018, he met with the prosecutors on Mr. Hernandez's case. He denied knowing Mr. Hernandez, and was dishonest about the number of murders in which he had participated. He hoped that by cooperating, he would get his sentence reduced. (A-1158-61.)

On cross-examination, Chang admitted that, in addition to his 15 murders, he had seriously injured another 15 people. (A-1166-67.)

### 2. Other witnesses.

MIGUEL REYNOSO was a detective for a Honduran prosecutor's office, "The Office for the Fight Against Drug Trafficking." He testified that he and fellow officers searched two cars on June 6, 2018, to find evidence of drugs, weapons and money laundering. In one of the cars, they recovered ledgers, one of which listed the name, "Tony Hernandez." (A-260-73.) This stood out to him, as the "Tony Hernandez case was very well-known in Honduras." (A-315.)

GEORGE PAPADOPOULOS, Assistant Special Agent in Charge ("ASAC") of the DEA Special Operations Division, testified about a meeting he attended in Miami on October 25, 2016, with Mr. Hernandez, his attorney, a prosecutor from the Southern District of New York, another DEA agent, and an interpreter. The meeting was conducted pursuant to a proffer agreement signed by Mr. Hernandez, his attorney, the prosecutor, and Papadopoulos, as a witness. (A-1095-97.)

Mr. Hernandez was shown pictures and videotapes of, and questioned about, various drug traffickers, including Leo Cachiro, Alero Ramirez, Don H, Carlos Toledo, Rojo, Mario Jose Calix, Alex Ardon, and the Valle brothers. (A-1099-1108.) According to Papadopoulos, Mr. Hernandez said he had never received money from drug traffickers or provided assistance to them. The interview ended when the prosecutor said he was not being truthful and the meeting was over. (A-1108.)

CODY TOY, firearms enforcement officer with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), was qualified as an expert in firearms, machineguns, and destructives devices. He testified about the various weapons other witnesses had said were possessed or sold by Mr. Hernandez, co-conspirators, and people providing security for them. He testified that a number of

the weapons qualified as machineguns because they were able to fire automatically or in bursts. (A-1185-1207.) He also testified that an RPG is a rocket-propelled grenade, and is an explosive device. (A-1208-09.) Toy brought with him exemplars of various weapons, and demonstrated how they worked.

SANDALIO GONZALEZ, a group supervisor in the DEA's Bilateral Investigations Unit, testified about the arrest and interrogation of Mr. Hernandez following his arrest at the Miami Airport on November 23, 2018. He explained to Mr. Hernandez that he was being arrested for federal narcotics violations and weapons-related offenses. He explained to Mr. Hernandez that he could cooperate or not, and plead guilty or not, and said Mr. Hernandez said he wanted to cooperate. (A-748-49.)

By stipulation, the government entered into evidence a disk containing segments of the interview of Mr. Hernandez (GX 403), and a transcript containing transcriptions and translations of those segments (GX 403-T). Most of Gonzalez's testimony consisted of playing the segments and having him introduce or explain them.

Toward the beginning of this, Gonzalez mentioned to Mr. Hernandez that he had called a "Mr. Retureta," whom he testified was "an attorney that the defendant asked that I call prior to him cooperating." (A-751-52.) When Gonzalez told Mr.

23

Hernandez that he could not reach Mr. Retureta, Mr. Hernandez said "he wanted to continue, go forward and cooperate." (A-752.)

In the segments of the interrogation played during Gonzalez's testimony, Mr. Hernandez identified and admitted knowing many of the drug traffickers described by the cooperating witnesses, including Carlos Mauricio Toldeo, who he said was his "best friend" (A-755, 759-60); Hector Emilio Fernandez a/k/a Don H (A-757); Victor Hugo Diaz Morales a/k/a El Rojo (A-757); Mario Jose Calix (A-758); Devis Leonel Rivera Maradiaga and Javier Rivera Maradiaga (A-763-64); Luis and Miguel Valle Valle (A-764-65); Mr. Pinto (A-765); and Juan Carlos Valenzuela (A-788-89) .

Gonzalez also questioned Mr. Hernandez about various topics, including kilos marked with "TH" (A-761); when he became involved in drug trafficking (A-762); his brother's position in Congress and then the Presidency (A-762); the Cachiros drug trafficking organization; locations where traffickers held meetings (A-763); cocaine being sent to the United States (A-790); and his use of guns, and possession of gun permits in his own name and those of other people, which were seized from him (A-790-94).

### 3. The Verdict.

The jury found Mr. Hernandez guilty on all four counts.

**D. Sentencing.**

The district court sentenced Mr. Hernandez to life terms of imprisonment on Counts One and Three, and a 60-month term on Count Four, all to run concurrently, and a consecutive, mandatory 360-month term of imprisonment on Count Two[4].

---

[4] The Court's Statement of Reasons, read at sentencing, is attached to the Judgment. (SPA-9-13.)

## ARGUMENT

### POINT I

**THE DISTRICT COURT ERRED WHEN IT FAILED TO SUPPRESS MR. HERNANDEZ'S STATEMENT, AS AN AGENT INTERROGATED HIM DESPITE KNOWING HE WAS REPRESENTED BY COUNSEL, HE UMABIGUOUSLY ASKED THAT HIS ATTORNEY BE CALLED, AND HE WAS TRICKED AND MANIPULATED INTO WAIVING HIS RIGHT TO REMAIN SILENT.**

The district court erred when it denied Mr. Hernandez's motion to suppress statements made by him after being arrested, as they were obtained in violation of: the "no contact rule," as the government knew Mr. Hernandez was represented by counsel when agents questioned him; and the Fifth and Sixth Amendments, in that Mr. Hernandez invoked his right to counsel by asking that his attorney be called before he was interrogated, and only waived his right to remain silent as the result of trickery and manipulation by the agents.

### A. Factual Background.

The factual record on which the district court relied was contained within Mr. Hernandez's memorandum in support of his motion, which included excerpts from the Proffer Agreement executed on October 25, 2016, and emails between

defense counsel and a prosecutor and an agent, in 2016 and 2017 (A-44-54); a draft transcript of the recorded portion of the interrogation of Mr. Hernandez on November 23, 2018, which was attached to his memo (A-55-110); and 11 exhibits attached to a declaration submitted by a prosecutor in opposition to the suppression motion, including, notably a DEA Form 6, "Report of Investigation," describing the arrest and interrogation of Mr. Hernandez. (A-111-61.) The court also questioned the government regarding factual issues at the argument on the motion.

In October 2016, Attorney Manuel Retureta contacted the U.S. Department of Justice ("DOJ") to schedule a meeting between Mr. Hernandez and relevant prosecutors and law enforcement personnel. At the ensuing proffer in Miami on October 25, 2016, AUSA Matthew Laroche, ASAC George Papadopoulos, and DEA Special Agent Stephen Fraga attended on behalf of the government. (A-210.)

The proffer was conducted pursuant to a standard proffer agreement, signed by Mr. Hernandez, Attorney Retureta, AUSA Laroche, and ASAC Papadopoulos. AUSA Laroche advised Mr. Retureta and Mr. Hernandez at the conclusion of the meeting that the prosecution team did not believe the defendant had been honest during the session. (A-45-46.)

On May 19, 2017, Attorney Retureta sent AUSA Laroche an email requesting a telephone call "regarding Tony Hernandez," and Laroche replied and

suggested a convenient time. (A-47.). In October 2017, Agent Fraga exchanged text messages with Attorney Retureta about meeting for lunch to discuss Mr. Hernandez, among other issues. (A-48.)

On November 23, 2018, agents from U.S. Customs and Border Protection ("CBP") arrested the defendant at Miami International Airport, where he was changing planes to return to Honduras. ASAC Papadopoulos, Special Agents Sandalio Gonzalez and Gus Sachetti, and other DEA personnel, participated in the arrest. (A-114-15.)

At approximately 11:10 a.m., ASAC Papadopoulos and Agents Gonzalez and Sachetti transferred Mr. Hernandez to a private room at the CBP office. Gonzalez asked Mr. Hernandez for the code to unlock his iPhone, which he provided. Gonzalez explained that Mr. Hernandez was under arrest for drug trafficking and making false statements to federal officials, and could cooperate with law enforcement or not, or plead guilty to the charges or not. (A-116.)

The defendant responded, in substance, that he wanted to cooperate with the agents, "and specified that he told *his lawyer* over a year ago, that he wanted to cooperate and he (lawyer) told him that he would speak with prosecutors, but never notified HERNANDEZ-Alvarado." (*Id*) (Emphasis added). SA Gonzalez "asked HERNANDEZ-Alvarado if he presently had a lawyer and HERNANDEZ-

Alvarado stated that he had not spoken to 'Manny' in over a year *but would like to call him first*." (*Id*) (Emphasis added)[5].

Agent Gonzalez contacted AUSAs Emil Bove and Laroche who gave him permission to call Retureta. (*Id.*) Gonzalez placed calls to Retureta at a number in Washington D.C., at 11:36 a.m. and 11:38, with no answer. He did not leave messages. (*Id.*; A-119.)

Gonzalez consulted AUSAs Bove and Laroche again after these unanswered calls. (A-116.) They told him to stop to any communications. (A-188, 211.). Gonzalez informed Mr. Hernandez that he was to be processed and taken to jail without an interview, and Mr. Hernandez responded that he wanted to begin cooperating. (A-116, 211.) Gonzalez placed another call to Mr. Retureta at 11:54, with no answer. Gonzalez asked Hernandez again, with input from the AUSAs, if he "presently had legal representation," to which Hernandez replied that he "did not know." (*Id.*)

Gonzalez informed Mr. Hernandez that if he had an attorney, he would be entitled to consult that attorney prior to cooperating, but that if he wanted to speak with agents he would have to agree to this "voluntary participation" in a recorded interview. He also said that Mr. Hernandez was not being tricked or pressured, and

---

[5] At trial, SA Gonzalez testified that "Mr. Retureta" was "an attorney that the defendant asked that I call prior to him cooperating." (A-751-52.)

agreeing to this interview would not result in his release or "avoid him going to jail later that day." (A-117, 211.)

At about 12:20 pm, Mr. Hernandez was taken to the DEA office, processed, and, at 12:37 p.m., given *Miranda* warnings in Spanish. Hernandez signed the advice of rights forms and agreed to speak to the agents. Special Agent Gonzalez told the defendant, "[A]s I told you, you can add a lawyer to the process at any time." (A-117, 120-21.)

The agent began by saying he wanted to repeat what Mr. Hernandez had told him earlier, to wit: "That you wish to proceed and make a statement and talk with us. You do not have legal representation today … now. Huh … You will be talking to a lawyer in the future, but you wish to start this process now." Mr. Hernandez replied, "That's right. I want to start." Gonzalez noted, "And we called Mr. Retureta several times but he did not answer. But you still wish to go ahead." Mr. Hernandez answered, "I do." (A-55.)

Several times during the interrogation, Mr. Hernandez described conversations he had with Attorney Retureta ("Manny") after the proffer with the government in October 2016. He said that, "what I was discussing with Attorney Retureta was that I was prepared to come over here in case you all wanted to continue having some clarifications or for me to continue answering questions

from you all. And at that time, why, the lawyer told me: 'Let's wait; they will let us know.'" (A-58.) Mr. Hernandez said he had last talked to Retureta about one year earlier, to which SA Gonzalez replied, "Then he is not your lawyer today … until you talk to him again." Noting he had "lost touch with him," Mr. Hernandez said, "Let's hope that he …that he will join the process." (*Id.*)

Agent Gonzalez warned him that he could not expect to "walk free today" by minimizing his relationships with drug traffickers. Mr. Hernandez replied, "Yes, that's what I would tell Manny. 'Manny,' I says to him, 'how did I participate in those comings and goings, in whatever. I don't know. You tell me…'" (*A-61-62.*)

Gonzalez said he understood if Mr. Hernandez was afraid of speaking about certain people. Mr. Hernandez replied that some traffickers who had been extradited to the United States had threatened that someone in his family would pay for what his brother, the Honduran President, "did by sending them over here." He continued, "Yes, that's why when I was telling Manny: 'Manny, people know because they went on the media saying that I had come over.' That they said I never came." (A-73.)

Accused by Gonzalez of not being forthcoming about the traffickers with whom he had worked, Mr. Hernandez said did not want to "invent" the names of

people and say he had worked with them.  He explained, "That's why, since the last time, I … 'I want to know,' I says to Manny. 'What can I support?  What I am being accused of? To be able to …'" (A-104-05.)

At approximately 2:41 p.m., after the conclusion of the interrogation, Attorney Retureta sent an email to Special Agent Fraga stating, "I understand you and yours are busy with Tony Hernández?" (A-122). At about 2:53, Retureta sent an email to AUSA Laroche stating, "Please note that I continue to represent [the defendant]. Please make any necessary inquiries through me as he does not wish to speak without defense counsel present." (A-125.) At approximately 3:17, Retureta emailed Gonzalez, stating, "I understand Tony Hernandez was arrested in Miami. You involved? Is Hernandez detained in Miami? Please note that I continue to represent him and I ask that there be no questioning outside my presence." (A-123.)

## B. The Court's Decision.

The district court denied the motion to suppress.  It disregarded the argument alleging violation of the no contact rule, based on *United States v. Hammad*, 858 F.2d 834, 839 (2d Cir. 1988), explaining, "New York follows a different rule," and New York Disciplinary "Rule 4.2(a) requires actual knowledge of the fact in question rather than reasonable belief." The court held the government did not

have such actual knowledge that Retureta represented Mr. Hernandez. (A-215-16.)

The court also rejected the Fifth and Sixth Amendment arguments, finding there was "no unambiguous invocation on the right to counsel," and there was a "knowing and voluntary and intelligent waiver of *Miranda*." (A-216.)

**C. The government violated the no-contact rule when they interrogated Mr. Hernandez outside the presence of counsel despite knowing he was represented.**

Title 28, United States Code, section 530B(a) provides, "An attorney for the Government shall be subject to State laws and rules, and local Federal court rules, governing attorneys in each State where such attorney engages in that attorney's duties, to the same extent and in the same manner as other attorneys in that State." Section 530B(b) states, "The Attorney General shall make and amend rules of the Department of Justice to assure compliance with this section."

The "no-contact" rule of New York's Code of Professional Responsibility, promulgated in 2009, states:

Communication With Person Represented By Counsel

(a)     In representing a client, a lawyer shall not communicate or cause another to communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter,

> unless the lawyer has the prior consent of the other
> lawyer or is authorized to do so by law.

N.Y. Rules of Prof'l Conduct 4.2(a), 22 N.Y.C. R.R. § 1200 ("Rule 4.2").

In *United States v. Hammad*, 858 F.2d 834, 839 (2d Cir. 1988), the Second Circuit found that the government violated Model Code of Professional Responsibility DR 7-104(A)(1) when, prior to the defendant's indictment, the prosecution had a confidential informant record the defendant and show the defendant a fictitious subpoena created by the prosecution.

DR 7-104(A)(1), a predecessor to Rule 4.2, similarly provided that:

> A. During the course of his representation of a client a
> lawyer shall not:
>
> 1. Communicate or cause another to communicate on the
> subject of the representation with a party he knows to be
> represented by a lawyer in that matter unless he has the
> prior consent of the lawyer representing such other party
> or is authorized by law to do so.

In *Hammad*, the Second Circuit recognized that "under DR 7-104(A)(1), a prosecutor is 'authorized by law' to employ legitimate investigative techniques in conducting or supervising criminal investigations, and the use of informants to gather evidence against a suspect will frequently fall within the ambit of such authorization." Id. at 840. The Court, however, explained that "in some instances a government prosecutor may overstep the already broad powers of his office, and in

so doing, violate the ethical precepts of DR 7-104(A)(1)," and found that the prosecutor's use of the fictitious subpoena was such a circumstance, "which contributed to the informant's becoming that alter ego of the prosecutor." *Id.*

The *Hammad* court "declined to list all possible situations that may violate DR 7-104(A)(1)," explaining that "[t]his delineation is best accomplished by case-by-case adjudication, particularly when ethical standards are involved." Id.

The *Hammad* court went on to find that suppression can be ordered as a remedy for a violation of this ethical rule, but ultimately declined to suppress the evidence at issue because "the law was previously unsettled in this area." *Id.* at 842. The Second Circuit explained that, in future cases, "suppression may be ordered in the district court's discretion." *Id.* at 840, 842.

While courts have disagreed as to whether the disciplinary rule applies in the investigative stages of a case, *see, e.g., United States v. Ryans,* 903 F.2d 731 (10th Cir. 1990), *cert denied*, 498 U.S. 855 (1990), there is no question it applied here, as Mr. Hernandez was already indicted and the government had obtained an arrest warrant. The district court did not find the New York rule inapplicable, but incorrectly found the government did not know – as opposed to having a reason to know – Retureta still represented Mr. Hernandez.

There is no question the government knew Retureta represented Hernandez.

It would be difficult to imagine more overt evidence of that fact. *First*, Retureta arranged to have Mr. Hernandez meet with the government, regarding *the same* subject matter, and accompanied him to the proffer. *Second*, AUSA Laroche and Agent Papadopolous attended the 2016 proffer and were involved in the 2018 arrest*,* so they were certainly aware of Retureta and familiar with the subject matter of the interview. *Third*, Retureta continued to reach out to the government, emailing AUSA Laroche on May 19, 2017, in an attempt to secure an additional meeting to discuss Hernandez, and SA Fraga, who had attended the October 2016 proffer, in October 2017. *Fourth*, when Mr. Hernandez was arrested, he specifically asked to speak to Retureta before proceeding, and referred to conversations he had had with Retureta several times during the interrogation.

Any assertion to the contrary is disingenuous. The government had no information that Retureta *no longer* represented Mr. Hernandez. They acknowledged that the subject of Retureta's representation was on their radar before the arrest (there were "discussions prior to the arrest operation about how to handle [issues involving the no-contacts rule, Sixth Amendment and *Miranda*]," and the "discussions were based on the fact that [they] had not heard from Mr. Retureta for 18 months," and they knew Retureta had called the U.S. Attorney's office to ask about the status of the investigation.) (A-181-82.)

Because Retureta's potential involvement was contemplated, the "safeguards" put into place by the agents and the AUSA were a pretext. The agents called Retureta three times in 18 minutes and did not even leave a message for him (Retureta learned that Mr. Hernandez had been arrested from his family, who had been alerted by a person traveling with Mr. Hernandez). The government did enough to make a superficial record but not enough to actually safeguard the defendant's constitutional rights. For example, the agent asked the defendant whether the defendant had been "tricked" into making a statement. This question serves only to create a record and could never elicit a meaningful response.

Likewise were the calls the agent made at the onset. Had the government truly been concerned with discovering the truth about Hernandez' relationship with Retureta, they would have left a message or spoken to a secretary.

It is understandable that the government did not want to notify Attorney Retureta that they were going to arrest his client, and they were not required to do so. It is also understandable that they *wanted* to interrogate Mr. Hernandez outside the presence of counsel, although they were not entitled to do so. But, it is not understandable how the government can argue they did not know Mr. Hernandez was represented by Attorney Retureta.

**D. The government violated the Fifth and Sixth Amendments when they continued to question Mr. Hernandez after he asked to speak with his attorney, and tricked and manipulated him into proceeding in the attorney's absence.**

The district court also erred in finding there was "no unambiguous invocation on the right to counsel," and there was a "knowing and voluntary and intelligent waiver of Miranda."

An appellate court reviews the district court's finding of historical fact, including whether the suspect understood the *Miranda* rights, under the clearly erroneous standard. *United States v. Isam*, 588 F.2d 858, 862 (2d. Cir. 1978). However, the court's ultimate conclusion as to whether the suspect knowingly and voluntarily waived the rights is reviewed *de novo*. *United States v. Diaz*, 891 F.2d 1057, 1060-61(2d Cir. 1982).

Once an individual in custody invokes his right to counsel, interrogation "must cease until an attorney is present"; at that point, "the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning." *Miranda v. Arizona*, 384 U.S. 486, 474 (1966). In *Edwards v. Arizona*, 451 U.S. 477, 485 (1981), the Court found it "inconsistent with *Miranda* and its progeny for the authorities, at their instance, to re-interrogate an accused in custody if he has clearly asserted his right to counsel."

The *Edwards* Court noted, "When an accused has invoked his right to have

counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." *Id.* at 484. Further, an accused who requests an attorney, "having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Id.* at 484-485.

*Edwards* is "designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights." *Michigan v. Harvey,* 494 U.S. 344, 350, (1990), *Minnick v. Mississippi*, 498 U.S. 146, 150-51, 111 S. Ct. 486, 489 (1990).

Occasionally, whether a suspect's statement was intended to invoke his *Miranda* rights is unclear. The ambiguity may be the "result of events preceding the request or of nuances inherent in the request itself." *Smith v. Illinois,* 469 U.S. 91 (1984). In determining whether a particular suspect's request for counsel was ambiguous, "*post request* responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself." *Id.* (emphasis in original). Moreover, any "doubts must be resolved in favor of

protecting the constitutional claim," *Michigan v. Jackson*, 475 U.S. at 633, and the courts must "'indulge every reasonable presumption against waiver of fundamental constitutional rights,'" *Id.* (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). The courts must also "give a broad, rather than a narrow, interpretation to a defendant's request for counsel." *United States v. Quiroz*, 13 F.3d 505, 511 (2d Cir. 1993)

When he was arrested, and after being told he "could cooperate or not," Mr. Hernandez "stated that he wanted to cooperate and specified that he told *his lawyer* over a year ago, that he wanted to cooperate and he (lawyer) told him that he would speak with prosecutors, but never notified [Mr. Hernandez]." Asked if he "presently had a lawyer," Mr. Hernandez "stated that he had not spoken to 'Manny' in over a year *but would like to call him first*." (A-116, 210.)

This request was clear and unambiguous. Mr. Hernandez referred to Retureta as "his lawyer," and said he wanted to speak with him "first" – *i.e.*, before continuing to speak to the agents.

There was nothing ambiguous about Mr. Hernandez's invocation of his right to counsel. As noted, at trial, SA Gonzalez identified Retureta as "an attorney that the defendant asked that I call *prior to him cooperating*." (Emphasis added.) While this testimony was not before the court when it denied the suppression motion, it

demonstrates what should have been clear –Mr. Hernandez unambiguously invoked his right to counsel.

Once Mr. Hernandez invoked his right to counsel (and confirmed that he was represented by counsel), the agents were required to stop speaking to him. Once the right to counsel has attached and been invoked, law enforcement must honor it. This means more than simply that law enforcement cannot prevent the accused from obtaining the assistance of counsel. The Sixth Amendment also imposes on the State an affirmative obligation to respect and preserve the accused's choice to seek this assistance. *Maine v. Moulton*, 474 U.S. 159, 170-71, 106 S. Ct. 477, 484 (1985). At the very least, the prosecutor and police have an affirmative obligation not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel. *Id*.

Instead, they began to muddy the waters by repeatedly asked Hernandez whether he had a lawyer, until, confused by the agents' explanation, and after being prompted by the agent, Mr. Hernandez repeated what the agent said - that he did not have a lawyer *present,* so he did not have a lawyer. Yet, he said, "Let's hope that he …that he will join the process."

The lapse of one year since Mr. Hernandez had spoken to Retureta did not mean that Retureta no longer represented him. Rather, it was due to the fact that

the government had not been in touch with him, and there was nothing to report to Mr. Hernandez.

The agents gave Mr. Hernandez what amounted to false, or at least incorrect, legal advice, by saying that because Retureta was not present, he was not Mr. Hernandez's lawyer. The agent repeated this theme over and over before and during the interview. Gonzalez started the interview saying that because Retureta did not answer his phone, "You do not have legal representation, today ... now." He said that even though Retureta is his lawyer, "he is not your lawyer today … *until you talk to him again*." (Emphasis added.) The agent then elicited a *Miranda* waiver based on these false representations.

Waivers of counsel must not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege, a matter which depends in each case "upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938); *Fare v. Michael C.*, 442 U.S. 707, 724-725 (1979).

Because Mr. Hernandez's request for counsel was deliberately ignored, and Hernandez was misled into believing that his lawyer's actual presence had any bearing on his actual representation, any waiver of his right to counsel was

accordingly not knowing or voluntary.

Once an accused in custody unequivocally invokes the right to *remain silent*, interrogation must ordinarily cease. *Miranda*, 384 U.S. at 473-74; *Anderson v. Smith*, 751 F.2d 96, 101-02 (2d Cir. 1984). The purpose of this prophylactic rule is to counter the inherently coercive effects of custodial interrogations. *Miranda*, 384 U.S. at 467. The suspect, not the interrogator, is given control over the "time at which questioning occurs, the subjects discussed, and the duration of the interrogation." *Mosley*, 423 U.S. at 103-04.

Questioning can only be resumed after fresh *Miranda* warnings are given and the right to remain silent is otherwise scrupulously honored, for example, by renewing the questioning only after the passage of a significant period of time and by limiting the renewed questioning to a different subject matter than the original interrogation. *See, Mosley,* 423 U.S. at 104-07.

By contrast, the Second Circuit has said, once a suspect has invoked the *Miranda* right to counsel, the ban on further police initiated questioning is absolute. *United States v. Quiroz*, 13 F3d 505 (2d Cir 1993). Police may only reinitiate interrogation, notwithstanding a suspect's invocation of the right to counsel, after a break in custody that is sufficient in duration to dissipate its coercive effects, and established a bright line rule that a break in custody of at least

14 days is sufficient to permit the police to attempt to reinitiate interrogation. *Maryland v. Shatzer*, 559 U.S. 98 (2009).

While a defendant may reinitiate discussions with law enforcement, the decision must be his and not the product of undue influence. For example, in *Campaneria v. Reid*, 891 F.2d 1014, 1021 (2d Cir. 1989), the defendant, Campaneria, indicated that he did not want to answer questions and preferred that law enforcement return later. Assistant District Attorney DiNatale promptly told Campaneria that if he wanted to talk with them, "now was the time to do it."

Under these circumstances, the Second Circuit stated "we cannot say that Campaneria's invocation of his right to remain silent was scrupulously honored." *Id*. While the defendant was clear in this circumstance, "DiNatale's remark that 'If you want to talk to us, now is the time to do it' was not aimed at resolving any ambiguity in Campaneria's statement, but rather at changing his mind. This is precisely the sort of conduct the prophylactic rule seeks to prevent." *Id*.

This is precisely the case here. The agent did not question Mr. Hernandez to clarify whether Retureta still represented him, but *told* Mr.Hernandez that since his attorney was not present, that he did not have a lawyer. This was clearly intended to change Mr. Hernandez's and convince him to waive his Miranda rights.

Because Hernandez unambiguously invoked his right to counsel, his

subsequent Miranda waiver was neither voluntary nor knowing, and the government violated the no-contact rule, the district court erred in denying the defendant's suppression motion.

Admission of the statement was not harmless. The government's case depended on the testimony of its cooperating witnesses, and all were vulnerable to reasonable attacks on their credibility. They were all major, longtime, international drug traffickers, who had pled guilty pursuant to cooperation agreements to crimes as serious as those alleged against Mr. Hernandez, including drug trafficking and possession of guns, machineguns, and explosive devices. They trafficked in *tons* of cocaine, engaged in political corruption, and were responsible for many murders and injuries, one - _ - even while cooperating with the DEA. Several had lied or failed to disclose information during the process of cooperating. All were hoping that by cooperating, they would obtain lower sentences and avoid what would have been life sentences, so it was reasonable to argue that they had an interest in testifying in a way that was favorable to the government. They had all lied and been dishonest in the past, either in their statements to authorities or otherwise, and were the types of people about whom it could reasonably be argued that the jurors would not rely upon them in making important decisions in their own lives.

In Mr. Hernandez's statement, he admitted he knew each of the cooperating witnesses who testified against him, as well as many of the other traffickers and corrupt government officials with whom they said he was associated and worked. Mr. Hernandez's statement thus confirmed much of the cooperators' testimony.

At the same time, during the interrogation, Agent Gonzalez repeatedly both said and implied that Mr. Hernandez was minimizing his contacts and relationships with the various traffickers and corrupt officials, which would undermine his ability to cooperate with the government. If the jurors agreed with this perspective, they would have seen him as making falsely exculpatory statements, which would have had the effect of inculpating him.

## POINT II

## STATEMENTS BY THE GOVERNMENT DURING ITS SUMMATIONS WERE IMPROPER, INFLAMMMATORY AND PREJUDICIAL.

During its summations, the government repeatedly characterized comments made by defense counsel during opening statements, lines pursued by counsel on cross-examination, and arguments counsel made during summation as "distractions," designed to mislead the jury from the evidence in the case. The government characterized defense counsel's arguments as not merely incorrect or

unsupported by the evidence; they were "false," implying that they were made dishonestly. They said one of counsel's arguments was "frankly an effort to mislead you."

The effect was to impugn the integrity of defense counsel to an extent that the overall defense was infected in the eyes of the jury, thereby impairing the jury's ability to weigh the evidence and evaluate the credibility of the witnesses fairly.

## A. The Summations.

In its initial summation, the government addressed an argument it said defense counsel had made in his opening statement, to the effect that "the cooperating witnesses were shipped to the U.S., signed, sealed and delivered by Juan Orlando Hernandez." According to the government, not only was this "Wrong. Absolutely false." The government said, "[T]his argument about the supposed law enforcement policy of Juan Orlando Hernandez *is a distraction. It is intended as a sideshow* to get you to look away from what these witnesses said about what the defendant did." (A-1246-47) (emphasis added.) They continued, "And the reason for that is that the testimony from just one of these witnesses is enough to convict the defendant. And you heard from five of them." (A-1247.)

The government argued the cooperating witnesses' testimony about their

interactions with Mr. Hernandez was corroborated by the statement Mr. Hernandez

gave after being arrested (a recording of which had been introduced as GX 403, but

implied defense counsel's cross-examination of them had been in bad faith.

"Remember when defense counsel asked those witnesses whether they knew of

any corroborating evidence relating to the meetings they described, remember that?

The witnesses didn't know about this recording but you do."  (A-1249.)

The government continued to personalize its arguments.  It noted, "One of

the things defense counsel has suggested to you is that in this timeframe, 2004 to

2010, the defendant didn't have the type of connections, the type of access to

actually help with traffickers.  You're going to see from the defendant's phone that

that is absolutely *false*, just wrong."  (A-1260) (emphasis added.)

During its rebuttal summation, the government addressed defense counsel's

arguments concerning the drug ledger that was seized and had Mr. Hernandez's

name in it.  The government said, "Defense counsel argued that it took 13 days for

the detective's partner to put the ledger into evidence and that's why you should

ignore it."  The government said the argument went "nowhere," because the

detective reviewed it on the day he seized it.  They went on,  "So if it took 12 or 13

days or 12 or 13 years for the detective's partner to put this in an evidence locker is

irrelevant.  What matters is that it contains the defendant's name, and Detective

Reynoso told you that he saw that on that day." (A-1393.)

But, the government went beyond just addressing the merits of the argument. They noted, "It's not surprising that defense counsel wants you to ignore this evidence, but what is surprising is that defense counsel would make that argument after the parties agreed that this ledger could come into evidence and that it was seized on a particular day." (A-1392.) The government displayed a stipulation between the parties (GX 1005) that the ledger could come into evidence, and that it was seized as the result of a lawful stop and search[6]. Referring to the stipulation, the government noted, "I expect that the judge is going to tell you that you must accept these facts as true. This didn't say anything about planted ledgers. Nothing that the defense counsel argues now can change the facts that are in evidence." (A-1392-93.)

The government made a similar argument regarding the tape of the Denny's meeting made by Rivera Maradiaga (which he initially said he gave to the DEA on the day it was recorded but, on re-direct, admitted his attorney had given to them weeks later). The government displayed a stipulation between the parties (GX

---

[6] In pertinent part, GX 1005 set forth the parties' stipulation that, on June 6, 2018, Honduran Military Police Law Enforcement lawfully stopped two vehicles and lawfully seized two ledgers from a hidden compartment in one. It did not contain a stipulation as to what happened to the ledgers after they were seized. (A-264.)

1001), which said the parties agreed the recording was of a meeting on February 6, 2014, made by Maradiaga at the direction of the DEA, and could come into evidence[7]. (A-1394.)

The government said the jury could reject the argument that Maradiaga "somehow clipped that exhibit," because they could view the recording and would "find that you don't think that there is any editing." (*Id.*)

The government countered defense counsel's arguments, which they said "suggested that because the defendant had bank accounts he's innocent." (A-1395.) They noted that the "DEA does not have the ability to compel banks or businesses in Honduras to turn over their records. The defendant knew that he could keep a hundred bank accounts in Honduras and the DEA was not going to be able to compel those records." The government stated, "This is a distraction." (A-1396.)

Similarly, the government first addressed counsel's arguments regarding the trip Mr. Hernandez made to the United States that resulted in his arrest on the merits, noting the evidence that he had receipts from shopping and didn't take a private plane, but sat in a middle seat on a commercial flight, simply meant he

---

[7] As relevant here, GX 1001 identified GX 401 as a disk containing a video "of a February 6, 2-14 meeting in Honduras that was secretly recorded by Davis Leonel Rivera Maradiaga at the direction of the U.S. Drug Enforcement Administration." (A-992-93.)

might have had reasons for not wanting to draw attention to himself on the trip. (A-1397-98.) However, they went further. Noting Mr. Hernandez was carrying $8000 when arrested, the government argued, "So what is defense counsel talking about here? *They're trying to distract you*." (A-1398) (emphasis added.)

Finally, the government addressed what it said defense counsel had told the jury, that the government was not going to make the cooperating witnesses "turn over their drug money." The government said the argument was "completely false," in that the court, at sentencing, would determine what they had to forfeit. Further, one of the cooperators – Chang – had already been sentenced, and "turned over planes, helicopters, cars, Rolexes." The government concluded, "This argument is nonsense, and it was frankly *an effort to mislead you*." (A-1408) (emphasis added.)

## B. Applicable Law.

While inappropriate comments by the government during its summation do not always, by themselves, require reversal of a conviction in an otherwise fair proceeding, *United States v. Young*, 470 U.S. 1, 11-12 (1985), such comments do require reversal where they cause "substantial prejudice," by "so infecting the trial with unfairness as to make the resulting conviction a denial of due process."

51

*United States v. Elias*, 285 F.3d 183, 190 (2d Cir. 2002) (quoting *United States v.*

*Shareef*, 190 F.3d 71, 78 (2d Cir. 1999), in turn quoting *Darden v. Wainwright*,

477 U.S. 168, 181 (1986)).

In determining whether improper comments constitute prosecutorial

misconduct causing such "substantial prejudice," this Court "has adopted a three-

part test: the severity of the misconduct, the measures adopted to cure the

misconduct, and the certainty of conviction absent the misconduct." *Elias*, 285

F.3d at 190 (citing *Shareef,* 190 F.3d at 78); *see also United States v. Friedman,*

909 F.2d 705, 709 (2d Cir. 1990).


## C. The Government's Improper Comments Caused Substantial Prejudice.

The comments during the government's summation were prejudicial in at

least two ways. First, they told the jury that rather than merely being arguments

they should reject, the arguments made by defense counsel were somehow

improper.

Second, they impugned the integrity of defense counsel, by suggesting he

was being dishonest, unethical and tricky.   Such unethical behavior would have

called into question, in the eyes of the jury, every statement or argument defense

counsel made on behalf of his client. *See United States v. Carter*, 236 F.3d 777,

793 (6th Cir. 2001) (reversing conviction where prosecutor, *inter alia*, made "personal attacks on opposing counsel that may have affected the jury's view of counsel's entire defense.")

Here, there can be no doubt that the government's comments were improper and prejudicial. Clearly, given the volume of evidence presented by the government, the defense had an uphill battle. The only chance for success was to cast doubt on the credibility of the government's cooperating witnesses, who formed the centerpiece of the government's case. While the government produced evidence to corroborate the cooperating witnesses, this evidence was not sufficient, by itself, without interpretation and explanation by the witnesses, to convict Mr. Hernandez.

As noted above, the cooperating witnesses were vulnerable to reasonable attacks on their credibility. In rebutting these attacks, the government went beyond what was reasonable; they did not simply rebut defense counsel's arguments, but denigrated them, implied that they were somehow improper, and, by extension, implied that defense counsel was being dishonest in making them.

The government repeatedly referred to the arguments as "distractions," and even said one argument was "an effort to mislead you." According to the government, one argument was not simply irrelevant or unsupported by the

evidence, but was " a distraction … *intended* as a sideshow to get you to look away from what these witnesses said about what the defendant did." (Emphasis added.)

This implicit attack on counsel's credibility was particularly destructive in a case in which the defense was based on questioning the credibility of the government's witnesses.  Certainly, counsel's ability to attack the credibility of the government witnesses was unfairly prejudiced when his own credibility was impugned in this way.  The government's comments made it less likely the jury would consider the merits of the (reasonable) arguments regarding the credibility of the witnesses, and more likely they would reject the arguments because they adopted the government's view that defense counsel was attempting to mislead and distract them.

The government's comments about defense counsel's arguments concerning the ledgers seized from cars and the tape recording of the Denny's meeting secretly recorded by Rivera Maradiaga were particularly damaging. The comments insinuated that defense counsel had engaged in underhanded, improper and dishonest tactics when he had done no such thing.  While counsel had stipulated to the circumstances under which the ledgers were recovered, and the tape recording made, the stipulation did not preclude counsel from making arguments about how the evidence was later handled.  This was especially true of the Denny's recording,

as the government informed the court and defense that the witness, Rivera Maradiaga, lied, or at least testified incorrectly about, turning the recordings over to the DEA on the day they were made. It was left to the government to rehabilitate the witness by eliciting that, in fact, the recordings were turned over to the DEA weeks later by his attorney.

The government's comments during their rebuttal summation were additionally prejudicial because defense counsel did not have an opportunity to respond to them. *See Carter*, 236 F.3d at 793 (prosecutor's improper remarks included misrepresentations regarding "*critical* evidence at the close of trial with no opportunity for an argumentative response").

As to the second part of the analysis, the "measures adopted to cure the misconduct," there were no such curative measures. Admittedly, there were no objections to the government's improper comments or requests for curative instructions. Nonetheless, in *Friedman*, 909 F.2d at 710, this Court noted, "[i]n those cases where a prosecutor's improper remarks have not been deemed prejudicial, the record has disclosed emphatic curative instructions by the trial judge. [Citations omitted]."

Applying the third part of the test, we submit it cannot "confidently [be said] that a conviction would surely have been obtained in the absence of the

misconduct." *Friedman*, 909 F.2d at 710. While the government certainly presented a large quantity of evidence, its quality was suspect. As noted above, the case depended on the testimony of cooperating witnesses, whose credibility was subject to attack not just because their interests required them to testify in a way that was helpful to the government, but also because of their lifetimes of criminal and antisocial behavior, and prior lies and omissions when speaking to law enforcement, which made them not the type of people who would ordinarily be relied upon by reasonable people making important decisions in their own lives. In fact, we submit there is far less reason to be confident in the certainty of a conviction here than in *Friedman.*

In *Friedman*, the prosecutor employed his rebuttal summation to respond to defense counsel's comments on the methods used by the government in investigating a drug transaction. The prosecutor impugned defense counsel by implying that defense counsel's role was merely to win an acquittal, rather than seek justice. In that instance, defense counsel's objection was sustained and the court commented on the inappropriateness of the prosecutor's comments. Also during rebuttal, the prosecutor misconstrued arguments made by defense counsel regarding his client's lack of knowledge of the drug transaction at issue in the case. Defense counsel immediately objected and informed the court that the prosecutor

had alluded to an argument not previously made by the defense. That objection was overruled and the defendant eventually moved for mistrial. The motion was denied and the defendant was convicted on counts of conspiracy and possession of cocaine. *Id.* at 708.

This Court reversed Friedman's conviction, finding that the severity of the remarks made by prosecutors was sufficient to cause substantial harm to the defendant. *Id.* at 710. The Court said the prosecutor's comments had invited the jury "to conclude that everyone the Government accuses is guilty, that justice is done only when a conviction is obtained, and that defense counsel are impairing this version of justice by having the temerity to provide a defense and to try to "get the guilty off." *Id.* at 709. Furthermore, the Court found the trial court did not take curative measures sufficient to remedy that prejudice, calling the measures taken "modest." *Id.* The trial court sustained objections by defense counsel, but added only that the court did not find the comments appropriate. *Id.* The Court further criticized such mild reaction by the trial court, saying it left the jury with "seriously distorted views of the adversary process." *Id.* at 710.

Finally, addressing the third part of its test, the Court found it uncertain there would have been a conviction in the absence of the inflammatory remarks, as the evidence at trial contained "factors cutting both ways." *Id.* While the defendant had

been tape-recorded in a car making statements "the jury was entitled to conclude indicated his knowledge of a cocaine transaction and his direction of it," the "defense theory that Friedman was discussing only a marijuana transaction was *not implausible*," and was not refuted by a witness the government chose not to call. *Id*. (Emphasis added.) Here, Mr. Hernandez's defense that the jury could not find proof beyond a reasonable doubt based on the testimony of unreliable cooperating witnesses easily passes the "not implausible" test.

Even before the three-part test used in *Elias* and other cases, this Court reversed convictions due to improper prosecutorial remarks. In *United States v. Burse*, 531 F.2d 1151, 1154 (2d Cir. 1976), where a defendant was convicted of conspiring to rob a federally insured bank, the prosecutor's summation included remarks which impugned the integrity of defense counsel due to defense counsel's aggressive line of questioning a witness. The Court referred to prosecutorial remarks such as "Mr. Stephens (Burse's lawyer) tried to get Barbara Ramos (a witness) to say…," and, "Mr. Stephens attempted to give you…the impression that…," as improper and "potentially derogatory." *Id.* Due to the inflammatory nature of the prosecutor's remarks, the trial court informed the jury that the prosecution's rebuttal was "replete with speculation" (internal quotations excluded), which the jury should not consider. *Id.*

It is a long-standing view that improper statements by prosecutors may result in reversal, *id.* at 1154, and the role of the United States Attorney is to ensure that justice is done, rather than simply win a case.  *Id.* To that end, the Court in *Burse* noted that "improper suggestions, insinuations…are apt to carry much weight against the accused when they should properly carry none." *Id.* The Court reversed the conviction, finding that even though the trial court informed the jury that the prosecution may have misconstrued evidence and that its summation was speculative, these curative measures were insufficient in light of the harm done. *Id.* at 1154-1155. Here, of course, the comments were also made by the government, with the same danger that, for that reason, they would be given undue weight by the jury.

## POINT III

**THE DISTRICT COURT FAILED TO ENSURE MR. HERNANDEZ RECEIVED A TRIAL BY AN IMPARTIAL JURY AND DUE PROCESS WHEN, AFTER DISMISSING ONE JUROR, IT DENIED A REQUEST TO DETERMINE WHETHER AT LEAST ONE MORE JUROR HAD BEEN SUBJECT TO THE SAME IMPROPER CONTACT.**

During the trial, the court received a note from an alternate juror expressing concern for his safety, given the nature of the case, and saying that he and at least one other juror had noticed someone who did not appear to be from the media

taking their pictures. The district court granted the request of both parties to dismiss the alternate juror, but denied Mr. Hernandez's request to conduct a further enquiry to determine if the second juror – and perhaps other jurors – had also been impacted.

The Court erred when it denied the request to conduct the requested inquiry. Consequently, Mr. Hernandez's right to trial by an impartial jury and due process was violated.

## A. Factual Background.

During the testimony of a witness, the court received a note from an alternate juror, "Juror 14," stating:

> Dear Judge Castel:
>
> Given the uncertain outcome of this trial and the severe consequences of a negative outcome for both the defendant as well as the Honduran government and the country's drug traffickers it occurred to me that it would be in the interests of several parties to interfere with the jury either in the form of persuasion or worse. From what I have seen in the trial thus far, the traffickers have the means, money, and motive to try something nefarious. What, if anything, has been discussed on the government's side to assure the jury's safety?
>
> This in no way affects my impartiality, nor have I mentioned it to the other jury members. I thank you for your consideration.

(A-768.)

The note continued:

> Since writing this note yesterday, myself and *at least one other juror* noticed we were photographed at close range just outside the courthouse by what appeared to be an individual with no media logo or identification. The photo was taken on a cellphone.

*Id* (emphasis added.)

Overnight, the government and defendant conferred. They advised the court that they agreed the juror should be dismissed. However, defense counsel asked the court to enquire regarding the second juror who observed the individual taking cell phone photos, and the discussion between the two jurors regarding their safety concerns. (A-774.)

The court denied the request, saying that, based on the language of the note, there was "no indication that he discussed his theories about somebody trying something nefarious with any other juror." (A-776.). The court said it did not wish to conduct an inquiry and create the seeds of concern where none existed. (A-776.) The court dismissed the juror who wrote the note, but did not ask about the second or any other jurors. (A-777.)

## B. Applicable Law.

A defendant has a constitutional right under the Sixth Amendment to be tried by an impartial jury, "unprejudiced by extraneous influence, and when

reasonable grounds exist to believe that the jury may have been exposed to . . . an [improper] influence, the entire picture should be explored. Often, the only way this exploration can be accomplished is by asking the jury about it." *United States v. Moten*, 582 F.2d 654, 664 (2d Cir. 1978) (internal quotation marks and citations omitted).

Concerns like those here also implicate a defendant's right to due process under the Fifth Amendment. The Supreme Court has held, "Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen.  Such determinations may properly be made at a hearing."  *Smith v. Phillips*, 455 U.S. 209, 217 (1982).

Thus, a district court has a duty to investigate where there is evidence of juror bias, *United States v. Schwarz*, 283 F.3d 76, 97 (2d Cir. 2002), and upon learning about an unauthorized communication, a trial judge *must* investigate to determine whether a juror's ability to perform her duty impartially has been adversely affected.  *United States v. Ruggiero*, 928 F.2d 1289, 1300 (2d Cir. 1991); *see also United States v. Aiello*, 771 F.2d 621, 629 (2d Cir. 1985).

To that end, the Court laid out a procedure to be used where a court learns about an unauthorized communication by a third person with a juror in *Aiello*. While the district court has broad discretion as to how to enquire, "unless the

communication with the juror is patently innocuous, the judge…would be well advised to hold a *voir dire* hearing." *Id.* In sum, the Court held that before taking any action, the district court "should determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate." *Id.*

## C. The district court failed to investigate despite knowing that a juror had noticed his or her picture being taken and discussed it with the juror who was dismissed, violating Mr. Hernandez's rights to trial by an impartial jury and due process.

The court's denial of Mr. Hernandez's request to conduct an investigation is hard to understand. The court agreed with the parties and dismissed Juror 14, based on his note indicating he had security concerns because of the nature of the case, which were heightened when he noticed someone taking his picture who did not appear to be from the media. While the first part of Juror 14's note said he had not communicated his safety concerns to other jurors (prior to being photographed), the second part of the note indicated at least one other juror had also noticed his picture being taken.

Since Juror 14 was aware of this, he must have spoken to at least one other juror about it. Although this was sufficient by itself to require the court to conduct an investigation, it also raised the likelihood that two jurors, sitting in a case like this, and sharing their observations about being photographed by a person who did

not appear to be from the media, would have shared their security concerns.

The court was required to determine if the concerns that had justified dismissing Juror 14 made it necessary to also dismiss the other juror. Since Juror 14 had said "at least one other juror" had also noticed themselves being photographed, the court should also have tried to determine if there were other jurors similarly affected. But the court conducted no such inquiry.

Further, if the juror or jurors believed the photographer was acting on Mr. Hernandez's behalf, that belief, would have tended to compromise the juror's ability to function as a fair and impartial juror. *See United States v. Dutkel*, 192 F. 3d 893, 897 (9th Cir. 1999) ("Where the intrusion is (or is suspected to be) on behalf of the defendant raising the claim of prejudice, the presumption arises automatically because jurors will no doubt resent a defendant they believe has made an improper approach to them.")

Finally, while the court was concerned that an inquiry might have raised "seeds of concern" where none existed, the court could simply have asked Juror 14, who was being dismissed, about what discussions he had had with other jurors. While the answer might have raised the need for further questioning, potentially of other jurors, an initial inquiry of Juror 14 would not have had any such potential, negative consequences.

Because the court knew at least one additional juror was photographed and

discussed this with Juror 14, the court had an obligation to conduct an investigation. Defense counsel made a clear and timely request for a further investigation that was denied by the court. Consequently, Mr. Hernandez's constitutional rights to be tried by an impartial jury and to due process were violated.

## CONCLUSION

For the above reasons, Mr. Hernandez's convictions should be vacated and the case remanded to the district court for further proceedings.

Dated: New York, New York
     October 12, 2022

Respectfully submitted,

/s/_____
Jesse M. Siegel (JS 7331)
*Attorney for Appellant*
*Juan Antonio Hernandez Alvarado*

299 Broadway, Suite 800
New York, NY 10007
212-207-9009
jessemsiegel@aol.com

## CERTIFICATE OF COMPLIANCE

I certify that the brief complies with the typeface requirements of Fed.

R. App. P. 32(a)(5) and the type style requirements of Rule 32(a)(6) because

it has been prepared in proportionally spaced typeface using Microsoft Word

2010 in Times New Roman, 14-point font.  Consistent with Rule

32(a)(7)(A), the brief contains 13,564 words.

/s/_____
Jesse M. Siegel (JS7331)
299 Broadway, Suite 800
New York, New York 10007
(212) 207-9009
*Attorney for Appellant*
*Juan Antonio Hernandez Alvarado*

Dated: New York, New York
     October 12, 2022

# SPECIAL APPENDIX

## <u>SPECIAL APPENDIX TABLE OF CONTENTS</u>

**Page**

Judgment, entered on March 30, 2021, Appealed
From........................................................................ SPA-1

AO 245B (Rev. 09/19)   Judgment in a Criminal Case         (form modified within District on Sept. 30, 2019)
                       Sheet 1

# UNITED STATES DISTRICT COURT

Southern District of New York

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **JUDGMENT IN A CRIMINAL CASE** |
| v. | ) | |
| JUAN ANTONIO | ) | Case Number:  1:S2 15 CR 00379-02 (PKC) |
| HERNANDEZ ALVARADO | ) | |
| | ) | USM Number:  17838-104 |
| | ) | |
| | ) | Peter Brill, Esq. (AUSA Matthew Laroche) |
| | ) | Defendant's Attorney |

## THE DEFENDANT:

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
   which was accepted by the court.

☑ was found guilty on count(s)     1, 2, 3, and 4.
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 21USC963, 18USC3238 | Conspiracy to Import Cocaine Into the U.S. | 12/31/2016 | 1 |
| 18USC924(c)(1)(A), 924 | Possession of Machineguns and Destructive Devices | 12/31/2016 | 2 |
| (c)(1)(B)(ii), 3238, & 2 | | | |

   The defendant is sentenced as provided in pages 2 through ___8___ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☐ Count(s) _____ ☐ is ☐ are dismissed on the motion of the United States.

   It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

3/30/2021
Date of Imposition of Judgment

_____
Signature of Judge

P. Kevin Castel, U.S.D.J.
Name and Title of Judge

3-30-21
Date

SPA-1

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 1A

| | Judgment—Page | 2 | of | 8 |

DEFENDANT:   JUAN ANTONIO HERNANDEZ ALVARADO
CASE NUMBER:   1:S2 15 CR 00379-02 (PKC)

## ADDITIONAL COUNTS OF CONVICTION

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18USC924(o) & 3238 | Conspiracy to Possess Machineguns and Destructive Devices | 12/31/2016 | 3 |
| 18 U.S.C. 1001 | Making False Statements | 12/31/2016 | 4 |

AO 245B (Rev. 09/19) Judgment in Criminal Case
    Sheet 2 — Imprisonment

Judgment — Page __3__ of __8__

DEFENDANT:   JUAN ANTONIO HERNANDEZ ALVARADO
CASE NUMBER:   1:S2 15 CR 00379-02 (PKC)

# IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:

Life imprisonment on Counts 1 and 3, and 60 months on Count 4, all to run concurrently, and a mandatory and consecutive 360 months on Count 2.

☐ The court makes the following recommendations to the Bureau of Prisons:

☑ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

    ☐ at _____ ☐ a.m. ☐ p.m.   on _____ .

    ☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐ before 2 p.m. on _____ .

    ☐ as notified by the United States Marshal.

    ☐ as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

SPA-3

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 3 — Supervised Release

Judgment—Page __4__ of __8__

DEFENDANT:   JUAN ANTONIO HERNANDEZ ALVARADO
CASE NUMBER:   1:S2 15 CR 00379-02 (PKC)

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of:

5 years on Counts 1 to 3 and 3 years on Count 4, all to run concurrently.

## MANDATORY CONDITIONS

1. You must not commit another federal, state or local crime.
2. You must not unlawfully possess a controlled substance.
3. You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
   - ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4. ☐ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5. ☑ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6. ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7. ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

SPA-4

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 3A — Supervised Release

| | | | |
|---|---|---|---|
| Judgment—Page | 5 | of | 8 |

DEFENDANT:  JUAN ANTONIO HERNANDEZ ALVARADO
CASE NUMBER:  1:S2 15 CR 00379-02 (PKC)

## STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.  You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2.  After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3.  You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4.  You must answer truthfully the questions asked by your probation officer.
5.  You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6.  You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7.  You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8.  You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9.  If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10.  You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11.  You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12.  You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____   Date _____

SPA-5

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
                        Sheet 3D — Supervised Release

| | Judgment—Page | 6 | of | 8 |

DEFENDANT:  JUAN ANTONIO HERNANDEZ ALVARADO
CASE NUMBER:  1:S2 15 CR 00379-02 (PKC)

## SPECIAL CONDITIONS OF SUPERVISION

1. You must obey the immigration laws and comply with the directives of immigration authorities.

2. You must provide the probation officer with access to any requested financial information.

3. You must not incur new credit charges or open additional lines of credit without the approval of the probation officer unless you are in compliance with the installment payment schedule.

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties

|  | Judgment — Page | 7 | of | 8 |

DEFENDANT: JUAN ANTONIO HERNANDEZ ALVARADO
CASE NUMBER: 1:S2 15 CR 00379-02 (PKC)

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| TOTALS | $ 400.00 | $ | $ | $ | $ |

☐ The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss*** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| | | | |

| | | | |
|---|---|---|---|
| TOTALS | $ 0.00 | $ 0.00 | |

☐ Restitution amount ordered pursuant to plea agreement $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐ the interest requirement is waived for the   ☐ fine  ☐ restitution.

☐ the interest requirement for the   ☐ fine  ☐ restitution is modified as follows:

\* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
\*\* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
\*\*\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

SPA-7

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

Judgment — Page   8   of   8

DEFENDANT:  JUAN ANTONIO HERNANDEZ ALVARADO
CASE NUMBER:  1:S2 15 CR 00379-02 (PKC)

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A  ☑  Lump sum payment of $   400.00   due immediately, balance due

     ☐  not later than _____ , or
     ☐  in accordance with  ☐ C,   ☐ D,   ☐ E, or   ☐ F below; or

B  ☐  Payment to begin immediately (may be combined with   ☐ C,   ☐ D, or   ☐ F below); or

C  ☐  Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of
     _____ *(e.g., months or years),* to commence _____ *(e.g., 30 or 60 days)* after the date of this judgment; or

D  ☐  Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of
     _____ *(e.g., months or years),* to commence _____ *(e.g., 30 or 60 days)* after release from imprisonment to a
     term of supervision; or

E  ☐  Payment during the term of supervised release will commence within _____ *(e.g., 30 or 60 days)* after release from
     imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F  ☐  Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

Case Number
Defendant and Co-Defendant Names
*(including defendant number)*     Total Amount     Joint and Several
Amount     Corresponding Payee,
if appropriate

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☑  The defendant shall forfeit the defendant's interest in the following property to the United States:
Forfeiture ordered in the amount of $138,500,000.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

United States of America v. Juan Antonio Hernandez Alvarado
15 cr 379 (PKC)
Statement of Reasons
<u>Sentencing, March 30, 2021 at 2 p.m.</u>

After hearing the evidence at trial, a twelve-person jury found beyond a reasonable doubt that Juan Antonio Hernandez was a member of a conspiracy to import drugs into the United States from 2004 to 2016.  In addition, the jury found him guilty of conspiracy to possess a machine gun in furtherance of drug trafficking and the substantive crime of possession of firearms, including a machine gun. The jury also found him guilty of lying in a 2016 voluntary interview with DEA Agents. Five cooperating witnesses testified at trial in addition to other witnesses and evidence, including photographs and recordings.

As a judge, I am frequently called upon to impose sentence upon individuals in the drug trade.  Some have become retail sellers infecting neighborhoods with a substance that destroys families and lives, through addiction, disease and violence, including turf wars and drive by shootings.  Some of these retail sellers come from families where the mother was an addict, or the father was imprisoned for drug related crimes. In many of these cases, the defendants are responsible for retail sales measured in grams. Often, they justly receive lengthy prison sentences. I also am required to sentence those buying or selling in kilo quantities. The quantity and type of drug plays an important part in sentencing.

I also see young men from Colombia who are caught in international waters on "go fast" boats loaded with cocaine with an ultimate destination of the United States after transshipment through Central America.  These "go fast" drivers typically have little knowledge of the source of the drugs or the distribution network beyond their own role.  Many are unskilled,

impoverished and endeavoring to support their families. They receive lengthy sentences for their actions.

And then there is Juan Antonio Hernandez Alvarado, also known as Tony Hernandez. He is 41 years of age, reasonably fit and in good health. He makes an excellent appearance, well-dressed, wearing a warm and engaging smile. He is well educated, went to a military boarding school and received a college degree in law. His family had legitimate businesses, including a hotel and a pharmacy, in which he could have earned a good, honest living. He briefly practiced law. He was elected as a member of the Honduran Congress and could have used his considerable talents for good. But Juan Antonio elected to go in a very different direction.

The trial of Juan Antonio unmasked many details of international narco-trafficking—state sponsored-narco-trafficking. It corrupts every facet of society. Juan Antonio became a major facilitator of the movement of cocaine through Honduras with an eventual destination of the United States. He became a partner in one of the ultimate sources of supply, a cocaine lab in Colombia. He brazenly had his own brand of cocaine imprinted with the initials TH for Tony Hernandez. I recall one cooperator estimating that he purchases 15,000 kilograms from Tony Hernandez.

The defendant is responsible for the murders of Franklin Arita, a trafficker who had interrupted the supply lines of Alex Ardon Soriano. He was murdered utilizing the services of Tigre Bonilla, a police chief. Also Chino, a member of the drug operation who had the misfortune of having been arrested was viewed as posing a threat because he knew too much about the drug operations and could cooperate with law enforcement. Juan Antonio wanted him murdered and when the job was done he expressed happiness.

2

SPA-10

Juan Antonio rented helicopters to drug traffickers and supplied them with weapons and ammunition, including in one transaction 4,000 to 6,000 pieces of amuntion for assault weapons that were boxed in containers with the markings of the Honduran Military. He acted as middleman in bribes to politicians, including his brother Juan Orlando Hernandez and the National Party. After his second meeting with Joaquin Guzman a/k/a El Chapo leader of the Sinaloa Cartel, he agreed to accept Guzman's offer of $1million in cash for his brother Juan Orlando's presidential campaign in exchange for a pledge of protection for his drug shipments and immunity. Guzman was not the only drug trafficker to whom Tony Hernandez sold protection from prosecution by the government and interdiction by the Honduran Military and National Police. In exchange for payments to him, he alerted drug traffickers to night vision helicopter maneuvers and radar patterns that might have resulted in seizing of shipments. For the radar information, he charged $50,000.

Facts, not speculation, enable the government to reliably estimate that the quantity of cocaine for which Juan Antontio bears responsibility from 2004 through 2015 is 185,000 kilograms. At 8,000 doses per kilogram, this translates to nearly 1.5 billion individual doses of cocaine. The gross income of Juan Antonio from drug trafficking during that same period is reliably estimated at $138,500,000 US dollars.

Defendant and his co-conspirators were indifferent to the consequences of their acts on the lives of people in their own country and in this country. A long sentence will promote respect for law and will serve as a deterrent to others who might engage in similar conduct. It will protect the public from further crimes of this defendant while he is incarcerated. I have considered the need to avoid unwarranted sentence disparities. The highest drug quantity for cocaine recognized by the Sentencing Guidelines is more than 450 kilograms. Very few

3

SPA-11

defendants, about 6.6% of drug trafficking cases in 2019, have a drug quantity in this highest range. Defendant is responsible for the distribution of 185,000 kilos. I have considered the arguments presented by each side on comparative sentence found in the government's submission at pages 51-55 and in the defendant's memorandum at 13-15.

I have considered the guidelines, policy statements and official commentary of the Sentencing Commission. I recognize that the guidelines are advisory and not binding on the Court. I acknowledge that I have variance discretion.

Defendant faces a mandatory minimum of 10 years on Count 1 and a mandatory consecutive 30-year minimum term of imprisonment on Count 2. By law, I am required to sentence him to a minimum of 40 years imprisonment on Counts 1 and 2. Again that is the minimum. The maximum term on each of Counts 1, 2 and 3 is life imprisonment and on Count 4 is 5 years imprisonment.

At total offense level 43 CHC 1, the Guidelines range is life imprisonment plus the mandatory consecutive term on Count 2 of 360 months. The prosecution and the Office of Probation recommend that I impose this sentence.

Based upon his free choice to engage in a life of drug trafficking over a 12-year period which affected the lives of the people in the United States, Honduras and elsewhere, a sentence of life imprisonment on Counts 1 and 3 is richly deserved, together with 5 years concurrent on Count 4. By law I am required to impose the 30-year mandatory minimum as consecutive to that on Count 3. I will impose forfeiture of $138,500,000 and the $400 special assessment. I will not impose a fine in view of the forfeiture amount. The foregoing in my view is sufficient but not greater than necessary to achieve the purposes of section 3553(a).

4

This Court is under no delusion that the sentence will end narco-trafficking through Honduras. But today's sentence is an important step. It is not the only prosecution in this district of individuals accused of using Honduras as a transit point for drugs. The experience of law enforcement with La Cosa Nostra or the Mafia--is instructive. By repeatedly going after leaders and organizers of these organized crime families, their impact has been weakened. They are a shadow of what they once were.

Ending the movement of cocaine from Columbia through Honduras, Guatemala and Mexico to the United States is the hope of all good people in Honduras, the United States and other countries of the Americas. Looking back in years to come, today may prove to have been an important step in eliminating the corruptive and corrosive influence of narco-trafficking.

SPA-13